Parkhurst v. Mexican Southeastern R. R. Co.

---

## Nelson D. Parkhurst et al. v. The Mexican Southeastern R. R. Co. et al.

1. JURISDICTION—*Of the Courts of This State to Enforce the Liability of Stockholders of Insolvent Foreign Corporations.*—In this State, no action will lie against a stockholder of an insolvent foreign corporation to enforce the payment of his liability for unpaid subscriptions.

2. STOCKHOLDERS—*Of Foreign Corporations—Jurisdiction of the Courts of Illinois to Determine Their Liability.*—The courts of Illinois have no jurisdiction of a creditor's bill to determine the liability of resident stockholders of an insolvent corporation of another state.

3. SAME—*Liability Does Not Exist at Common Law.*—The individual liability of stockholders of corporations to creditors is always a creature of statutory enactment. It does not exist at common law.

4. SAME—*Formal Subscription Unnecessary to Make One a Stockholder.*—As between the corporation itself and the alleged stockholder no formal contract of subscription is necessary. The issuance of stock to and acceptance by a person makes him a stockholder without any formal subscription or contract to receive and pay for the same, and a contract to pay for it will be implied under such circumstances.

5. SAME—*When the Liability is Transferred by Assignment of the Stock.*—When the stock is transferred in good faith, to a responsible person, and not for the purpose of escaping liability, such transfer has the effect to release the liability of the person making the assignment and to transfer it to the assignee.

**Bill to Fix the Liability of Stockholders.**—Appeal from the Circuit Court of Cook County; the Hon. EDWARD F. DUNNE, Judge presiding. Heard in the Branch Appellate Court at the October term, 1901. Affirmed. Opinion filed July 2, 1902.

ABEL L. ALLEN, attorney for appellants; FREEMAN K. BLAKE, of counsel.

WILLIAM D. WASHBURN, attorney for appellee Allerton; FRANK P. SECOR and EDWIN A. MUNGER, of counsel.

OPINION PER CURIAM.

This is a proceeding in chancery, whereby the several appellants, as judgment creditors of the Mexican Southeastern Railroad Company, under an ordinary creditor's bill, seek to compel payment of their claims by the appellee Samuel W. Allerton, as one of the several stockholders in said company. None of the other stockholders in the corporation, except Allerton, were made parties to the proceeding, and the bill was not filed on behalf of other creditors.

The cause, after being put at issue, was referred to Charles T. Farson, Esq., one of the masters in chancery in said court, to take proofs and report his conclusion upon the law and the facts, and he duly made his report.

The main contention, both before the master and before the court, was the extent of Allerton's liability. The master reported, on the question of jurisdiction, that the court was without jurisdiction, or at least that the court would refuse, for reasons of policy, or otherwise, to entertain jurisdiction of the case, but the court overruled the report in that respect and held it had jurisdiction, and decreed Allerton was liable for the face value of one share of stock, held by him; the appellants insisting before the court, and now, that Allerton was liable for the face value of 7,649 other shares of stock issued to him, but of which, as the court held, he had divested himself.

Both parties complain of the decree that was entered, and errors and cross-errors have been assigned upon the record in this court.

The master has ably discussed and considered the whole case, both as to the facts and the law, and for a thorough understanding of the case we incorporate the whole of his report herein. After reciting the recovery at law, in the Circuit Court of Cook County, by default, of four several judgments against the Mexican Southeastern Railroad Company and in favor of the appellants, severally, aggregating over $25,000, besides costs, and the issuance and return unsatisfied, of executions thereon, after demand, the master proceeds as follows:

"I further find that the Mexican Southeastern Railroad Company, defendant in the said judgments, had prior to the filing of the bill of complaint in this cause, wholly ceased to transact business, leaving the aforesaid debts due and unpaid, and that the said company had wholly abandoned its project of constructing the said lines of railway in the Republic of Mexico, and had closed its offices.

I further find that the said defendant corporation is and was at the time of filing the bill of complaint in this cause, wholly insolvent; that it never had any money in its treasury, and that it has not, and did not have at the time of the commencement of this suit, any other assets than the amount due to said corporation from the stockholders of the said company, on their stock liability.

I further find that on the 19th day of December, A. D. 1895, Emily B. Bary and George E. Detwiler entered into a memorandum agreement, purporting to be made with the Federal Government of the Republic of Mexico, but which was signed by the said Bary and Detwiler on the one part, and one Emilio Rabassa, of the other part, who states as follows: 'I am authorized by the Hon. Secretary of the Treasury to state to you that under the terms of this memorandum, the government will issue to you the respective concession.'

This memorandum agreement provides for the building of a railroad, by the said Bary and Detwiler, in the States of Oaxaca and Chiapas, in the Republic of Mexico, upon certain conditions and between certain points, and provides that the Government of Mexico will give to 'The Company,' a subsidy of six thousand ($6,000) dollars per kilometer, on all the lines, except the section from La Aurora to Tuxtla and Chiapas, on which the subsidy is to be eight thousand ($8,000) dollars per kilometer, the subsidy to be paid on

completion of sections of one hundred (100) kilometers, in five per cent redeemable silver bonds, of the public department, which 'The Company' shall receive at par.

I further find that on the 10th day of January, A. D. 1896, an agreement was entered into between Emil B. Bary and George E. Detwiler of one part, and Samuel W. Allerton, Robert P. Porter, H. M. B. Bary and Charles Bary, of the other part. Said agreement recites that the party of the first part are the concessionaires of a railroad, to be constructed in the Republic of Mexico, under the aforesaid agreement of December 19, 1895, and that they are desirous of associating with themselves the parties of the second part in the organization of a company for the construction of said railroad. Thereupon, in consideration of the services and the respective positions that the parties of the second part will occupy in said corporation, such as Robert P. Porter as president, S. W. Allerton as treasurer, H. M. B. Bary as general manager, and Charles Bary as counsel, the parties of the first part bargain, sell and transfer to the parties of the second part an equal and joint interest with the parties of the first part in fifty-one per cent of the said concession, each of the parties to the agreement to be entitled to eight and one-half per cent of the whole concession, or one-sixth of fifty-one per cent of the concession. The said fifty-one per cent is to be an undivided interest, and is to be held in trust for all of the parties by S. W. Allerton, trustee, and in case of the formation of the company as aforesaid, shall be issued to the said S. W. Allerton, as trustee, who shall vote the same under the direction and instruction of the majority of said parties.

I further find that on the 17th day of January, A. D. 1896, in pursuance of said agreement, a corporation was organized under the laws of the Territory of New Mexico in evidence in this case, under the name and style of the Mexican & Guatemala Colonization & Railroad Company, with a capital stock of ten million (10,000,000) shares, of one hundred ($100) dollars each. At the date of the organization of said corporation, it does not appear from the evidence that any of its capital stock had been subscribed for by any person.

I further find that at the time of the organization of said company certain statutes of New Mexico, as set out in the second amended bill of complaint in this cause, and the answer of defendant Allerton thereto, were in force, and were sections of the general act of the said Territory of

New Mexico under which the defendant company was organized.

I further find that in pursuance of the requirements of the said statutes of New Mexico, the first board of directors of the said corporation was organized by selecting and naming therefor, A. L. Morrison, George A. Johnson and E. A. Bartlett of the city of Sante Fe, in the Territory of New Mexico, together with the said Samuel W. Allerton, Robert P. Porter, George E. Detwiler, Charles Bary, H. M. B. Bary and Emil B. Bary.

I further find that all of the meetings of the board of directors of said corporation were held in the city of Chicago, and as far as the evidence in this case discloses, no meetings of the said directors were ever held in the Territory of New Mexico, and the said Morrison, Johnson and Bartlett, citizens of New Mexico as aforesaid, did not attend any of the meetings of the said board of directors.

I further find that by the charter of said corporation its principal place of business was to be located at Santa Fe, in the Territory of New Mexico, but that as a matter of fact its principal office was located and maintained in the city of Chicago, in said Cook county, and that the business of said corporation was mainly transacted in said city, and that from about the 1st day of May, A. D. 1897, said corporation maintained a suite of offices in said city of Chicago, in which all of its executive officers were located, and that they continued to occupy such offices until the corporation ceased to do business as aforesaid; and that from the said last mentioned date all meetings of the directors and stockholders of said corporation were held in said city of Chicago; that the various agents, servants and attorneys of the said corporation, employed in and about its business, were employed in the said city of Chicago; that an issue of bonds, intended to be sold for the use of said company, was printed, signed and made ready for use at the said city of Chicago, and that said company was up to the date of its ceasing to do business as aforesaid, performing and transacting all of the business of the corporation of any importance, except the work of the actual construction of the road, in the city of Chicago, in said Cook county. It does not appear from the evidence that any business whatever has been transacted in the Territory of New Mexico.

I further find that the first officers of said corporation were, Robert P. Porter, president; Samuel W. Allerton, treasurer; H. M. B. Bary, secretary; and that the said Samuel W. Allerton has been treasurer and director of said

corporation from January 17, 1896, the date of its organization, up to the time of his resignation as hereinafter set forth, and that during said time he participated in the transaction of all of its affairs and business, and that the indebtedness of each of the complainants was created while the said Samuel W. Allerton was treasurer and a director of said corporation, and while he was the owner and holder of stock therein as hereinafter set forth.

I further find that on the 11th day of August, A. D. 1896, by the authority of the board of directors and stockholders of said corporation, the name of said corporation was changed to the Mexican Southeastern Railroad Company. That it was provided and ordered that the certificates of stock of the Mexican & Guatemala Colonization & Railroad Company should be surrendered and canceled, and that stock of an equal amount should be issued to all of the stockholders in the new corporation to be known as the Mexican Southeastern Railroad Company.

I further find that on the 14th day of February, A. D. 1896, a meeting was held of the charter board of directors of the Mexican & Guatemala Colonization & Railroad Company, at the office of Samuel W. Allerton, in the city of Chicago, in said Cook county, and that there were present at said meeting Samuel W. Allerton, Robert P. Porter, H. M. B. Bary, Charles Bary, George E. Detwiler and Emil B. Bary, by Charles Bary, his attorney in fact. The minutes of this meeting recite that there was a proposition received from the owners of the concession from the Mexican Government, as evidenced by the memorandum agreement of December 19, 1895, to subscribe for nine million ($9,000,000) dollars of the stock of the company, and pay for the same by a transfer of said concession to the company. The owners of the concession at this time were Emil B. Bary, George E. Detwiler, Samuel W. Allerton, Robert P. Porter, H. M. B. Bary and Charles Bary. Thereupon the said proposition was accepted by the board of directors of the corporation, and a resolution adopted, which recites the entering into the memorandum agreement of December 19, 1895, by E. M. Bary and Detwiler, the making of the agreement of January 10, 1896, between Bary & Detwiler of the one part, and S. W. Allerton, Robert P. Porter, H. M. B. Bary and Charles Bary of the other part, by the terms of which the said E. B. Bary and Detwiler sold and assigned to the said Allerton et al., an interest in the said concession. Said resolutions further recite that the said S. W. Allerton, Robert P. Porter, H. M. B. Bary, George E. Det-

wiler, E. B. Bary and Charles Bary have bargained, sold, released and transferred to the Mexican & Guatemala Colonization & Railroad Company all their right, title and interest existing, and that might arise under the terms of said agreement of January 10, 1896, for and in consideration of nine million ($9,000,000) dollars of the stock of said company, said stock to be fully paid and non-assessable. Thereupon it was resolved by the said board of directors, for and on behalf of the company, that the said transfer by Allerton, Porter, Detwiler, H. M. B. Bary, E. B. Bary and Charles Bary, under the terms and conditions aforesaid, should be accepted, and that the sum of nine million ($9,000,000) dollars in stock of the company should be issued to the said E. B. Bary and George E. Detwiler, and that their subscription to the said amount of nine million ($9,000,000) dollars of the stock of said company, should be fully paid and non-assessable, and the stock was directed to be issued in conformity with said resolutions.

I further find that on the said 14th day of February, A. D. 1896, the said Robert P. Porter, Samuel W. Allerton, H. M. B. Bary, E. B. Bary and Charles Bary did, by a written instrument, bargain, sell, assign, release and transfer to the Mexican & Guatemala Colonization & Railroad Company all their right, title and interest in the said concession, in consideration of nine million ($9,000,000) dollars of the stock of said company, fully paid and non-assessable, to be issued to the order of George E. Detwiler and E. B. Bary.

I further find that no other or further consideration exists, or ever did exist, for the issuance of said stock than the agreement aforesaid of December 19, 1895, which was subsequently merged into a concession.

I further find that thereafter, and on the 17th day of June, A. D. 1896, a certificate of stock for ninety thousand (90,000) shares of the stock of said corporation, of one hundred ($100) dollars each, being certificate No. 1, was issued to the said Emil B. Bary and George E. Detwiler, said certificate being issued as shown by the stub thereto attached as 'Original payment in full for the concession;' that said certificate was received by the said E. B. Bary and Detwiler on the 18th day of June, A. D. 1896, and that upon the same day the said certificate was canceled, and the certificate of stock hereinafter mentioned, numbered 2, 3, 4, 5, 6, 7 and 8, were issued in place thereof.

I further find that among the certificates of stock issued

on said last mentioned date was certificate No. 6, for seven thousand six hundred and fifty (7,650) shares of the said capital stock, to the defendant, Samuel W. Allerton, and that thereafter, and on September 3, 1896, the said certificate was surrendered and canceled in consequence of the change of name of said corporation as aforesaid, and in lieu thereof another certificate of stock in the new corporation, known as the Mexican Southeastern Railroad Company, for the said amount of seven thousand six hundred and fifty (7,650) shares was issued to and accepted by the said Allerton.

I further find that thereafter, and on or about the 30th day of December, A. D. 1896, a concession was granted and promulgated, in pursuance of the said agreement of December 19, 1895, by the secretary of state for public communications and works of the Republic of Mexico, to Mr. William T. Pritchard, representing the Mexican & Guatemala Colonization & Railroad Company, for the construction of certain railways in the states of Chiapas and Oaxaca. By the said concession the said company was authorized to build for its own account, or for account of a company which might be organized for that purpose, and to operate for the term of ninety-nine (99) years, certain lines of railway, with telegraph and telephone lines, being three in number, one from San Geronimo, on the Isthmus of Tehauntepec, to a point on the frontier of Guatemala; another from Arista to Chiapa, on the river Chiapa, and another from San Benito to Tapachula, in the last named state. By the concession the company was required to finish one hundred (100) kilometers of the line from San Geronimo to the frontier of Guatemala within one year, and the whole of this main line within three years from the date of the concession; the branch lines mentioned to be finished within the next following seven years. By the said concession the right of way for seventy (70) meters in width, for the whole length of said roads, was conceded to said company, and the national lands which the said lines might occupy to the extent stated, and the lands necessary for stations, warehouses and other buildings, water tanks and other accessories to the lines, should be delivered to the company free of all charge, and the company was also authorized to take from the national lands and rivers the materials of all kinds that might be necessary for the construction, operation and reparation of the lines. The concession also provided that the deposit of minerals, coal, salt, marble and other mineral deposits which might be found in the execu-

tion of the works and excavations on the said lines within
the right of way should become the property of the com-
pany.

By the said concession the Federal Government of Mexico
agreed to give to said company a subsidy of six thousand
($6,000) dollars for each kilometer of road the said com-
pany might build on all of said lines, when approved by the
department of public communications and works, excepting
the line from Aurora to Chiapa de Corso, on the river
Chiapa, on which line the subsidy was to be at the rate of
eight thousand ($8,000) dollars for each kilometer of road.
Said subsidies were payable on the completion of each sec-
tion of 100 consecutive kilometers of road, on approval
thereof by the department of public communications and
works, in bonds of the interior redeemable debt, created
by the decree of September 6, 1894, said bonds to be deliv-
ered to the company at par.

Said company was also authorized to import certain
articles free of import and customs duties, and from all
taxes during the term of fifteen years from the date of the
concession, for the construction, operation, maintenance
and reparation of the said railway, telegraph and telephone
lines.

It was further provided by said concession that all of
the foreign and home made articles necessary for the con-
struction, reparation and operation of the said railways,
telegraph and telephone lines, should be exempt during the
period, fifteen (15) years, from the payment of octrol duties,
tolls, taxes, etc. It was also provided by said concession
that during the term of twenty (20) years from the date of
the concession the railway and its appurtenances, and the
capital employed in the construction and operation thereof,
and the shares of stock, bonds, and obligations of the said
company, should be exempt from the payment of all con-
tributions or imposts, excepting only the stamp.

Said concession further provided that as a guarantee of
the fulfillment thereof by the company, the concessionaires
on signing the same should constitute in the National Bank
of Mexico a deposit of fifty thousand ($50,000) dollars, in
bonds of the consolidated interior debt, at par, one-half
thereof to be returned to the company on the completion
of the line from San Geronimo to the frontier of Guatemala,
and one-fourth on the completion of the other subsidized
lines, the remaining one-fourth so remaining on deposit to
guarantee that part of the contract referring to the branch
lines and extensions which the company might elect to

build, but in the event of the forfeiture of the concession, the said deposit was to be forfeited.

Said concession contains numerous other provisions, which are not, however, material to the issues in this case.

I further find that about the sum of fifteen thousand ($15,000) dollars in money was deposited upon the granting of the foregoing concession.

I further find that the said company failed to comply with the terms of said concession for constructing the said lines of railroad within the time required, and that thereafter the said concession was forfeited by the Mexican Government.

I further find that prior to the filing of the original bill in this case Henry W. Leman was appointed receiver of said corporation by the District Court at Santa Fe, in the Territory of New Mexico, and that said receiver accepted said appointment and qualified as such receiver, and entered upon the performance of his duties, and has been since the date of such appointment, and still is, acting as such receiver by virtue of said appointment, and that the claims of each of the complainants in this suit, upon the judgments aforesaid, have been filed with said receiver.

I further find that at the date of the filing of the bill of complaint in this cause, the following persons constituted all of the stockholders of said corporation, and that the number of shares held by each, and the place of residence of each, was as follows:

Samuel W. Allerton, Chicago, Ill.............One share.
Robert P. Porter, New York, N. Y............650 shares.
Alice R. Porter, New York, N. Y ..........7,000 shares.
John D. Maclennan, Cleveland, Ohio.......15,649 shares.
Emil B. Bary, Boston, Mass...............22,350 shares.
P. J. Somers, Milwaukee, Wis..............1,250 shares.
Henrietta Bary, Boston, Mass.............. 3,825 shares.
Henry A. Bary, Boston, Mass. .............3,825 shares.
Edward L. Bartlett, Santa Fe, N. M...........70 shares.
George A. Johnson, Santa Fe, N. M............20 shares.
Alex. L. Morrison, Santa Fe, N. M............20 shares.
Max Frost, Santa Fe, N. M...................20 shares.
James A. Waller, Chicago, Ill..... ..........250 shares.
Charles Bary, Chicago, Ill.................43,700 shares.

Upon the foregoing statement of the facts in the case and some further findings of fact hereinafter set forth, I have arrived at the following conclusions of law in the case:

The first question which presents itself in the case is as

to the jurisdiction of this court to hear and determine the questions involved in this case, and to enforce the stock liability against the defendant Allerton only, in favor of the complainants in this suit. This question has been argued before me at considerable length by the counsel for the respective parties, and a large number of authorities have been cited upon both sides. There seems to be a conflict in these authorities as to the right of a judgment creditor to hold a single stockholder responsible for the satisfaction of his claim, as well as a conflict with regard to the policy of entertaining suits of this character to enforce stock liability, in any courts outside of the state creating the corporation. On the one hand is the case of Hatch v. Dana, 101 U. S. 205, holding the general doctrine, that in a case like the present, upon a creditor's bill by a judgment creditor to enforce stock liability, it is not incumbent upon the complainant to make parties defendant to his suit, the corporation, or any other stockholders except the one against whom liability is sought to be enforced. This case seems to be followed by a large number of other decisions, including decisions of the Supreme Court of Illinois, although no case in Illinois has been cited in which the doctrine was applied to a foreign corporation. On the other hand, is a class of cases of which the case of New Haven Horse Nail Company v. Linden Springs Company, 142 Mass. 349, is the type, in which case the Supreme Judicial Court of Massachusetts absolutely refused to maintain jurisdiction of a case of this character, brought against one of its own citizens who was a stockholder in a corporation organized in another state. The one class of cases seems to give attention only to the right of the judgment creditor, holding the doctrine that the stockholder is a debtor to the corporation to the extent of his stock subscription, that the liability is several, and that the judgment creditor ought to be permitted to enforce the liability against any individual stockholder wherever he can be found, and that it would be a hardship to impose upon the judgment creditor the responsibility of bringing into court the corporation and other stockholders. On the other hand it is urged with equal force that the hardship is just as great in the case of the stockholder; that where a corporation has become insolvent, in equity all of the solvent stockholders should contribute ratably to the payment of its debts, and the collection of the corporate debt out of an individual stockholder without means of contribution from his fellow stockholders, would be inequitable. In this case the plaintiffs in two of the judgments

mentioned in the bill of complaint, are citizens of this State; the defendant Samuel W. Allerton, who is the only defendant sought to be made liable in this case, is also a citizen of this State. The corporation was created and organized under the laws of the Territory of New Mexico, and the other stockholders live at various places in the United States of America, as hereinbefore set forth.

The further position is taken by counsel for the defendant Allerton, that irrespective of the question of hardship in holding his individuality responsible, this court is without jurisdiction to entertain this suit, and that jurisdiction for such purpose exists only in the courts of the Territory of New Mexico. It would be difficult to choose between the conflicting authorities relating to this question, were it not for the decision of the Supreme Court of this State in the case of Young v. Farwell, 139 Ill. 326, and the same case in the Appellate Court for the First District, which is here entitled Farwell v. Wadsworth, 35 Ill. App. 469, which in my opinion are quite decisive of the question of jurisdiction. This decision of our Supreme Court is based upon, and follows the aforesaid decision of the Supreme Judicial Court of Massachusetts, in the case of New Haven Horse Nail Company v. Linden Springs Company. The foundation doctrine of this case seems to be that the liability of a stockholder in a case of this character is a statutory liability, arising by force of the statute of the state where the corporation was created; that the statutory law at the date of the stock subscription, entered into, and formed a part of the contract of subscription, and that the courts of a foreign state will not entertain a suit to enforce the stock liability in such a case against its own citizens, at least until the courts of the foreign state have construed the act creating the liability and definitely fixed the terms of it.

Some confusion seems to have arisen in the authorities because of the inability of the courts to determine whether the stockholders' liability in a case of this kind is a statutory liability, or common law liability. To call it a contractual liability does not help the case, because a contract may be partly based upon a statute, as where the statute enters into and forms part of it, so that a contract liability may still be to some extent a statutory liability. There are statutes of the Territory of New Mexico in evidence in this case, which seem to have been intended to limit or define the liability of the stockholders in corporations created under that act. It is true that corporations existed at common law, and that subscriptions to their stock might

be made, and might be enforced by action, but there is probably no State in the Union at present where the organization and creation of corporations is not provided for by statute, and where the liability of stockholders is not to some extent provided for.   There is but very little common law to be found with relation to the right of judgment creditors to collect their judgments from delinquent stockholders, especially in cases where the stock was issued as paid-up stock, in exchange for property at a fixed valuation. Some of the cases seem to have gone so far as to hold, in such a case a creditor could not inquire into the transaction, and that the arrangement between the corporation and the stockholder was conclusive upon creditors.   The law as laid down by Cook on Corporations, section 30, is that the issuance of stock without sufficient consideration, or for property at an over-valuation, is not illegal and void at common law, and must be declared so by constitutional or statutory provision.   This author further says in section 46 that the rule seems to be that if the property taken in payment of stock had some substantial value. the transaction could not be attacked by creditors at common law, but that if the property was practically worthless, so that it was really a sale of the stock for nothing, the stockholders would be liable at common law to the creditors.   Another rule, which is supported by excellent authority, is that the individual liability of stockholders to creditors is always a creature of statute, and that it does not exist at common law. Terry v. Little, 101 U. S. 216; New Haven Horse Nail Co. v. Linden Spring Co., 142 Mass. 349; Cook on Corporations, Sec. 47.

In such cases, probably, where the primary right of the creditor to pursue the stockholder is denied, the equity is worked out by the appointment of a receiver for the corporation, and the collection of stock subscriptions by the corporation itself, through the agency of its receiver, when the subscriptions could be applied to the payment of the corporate debts.

In the case at bar, however, there would seem to be no doubt that the liability of the stockholders in the Mexican Southeastern Railroad Company is not a common law liability and can not be enforced upon common law principles.   As stated before, there are provisions contained in the statutes in evidence in this case which relate to stock liability, which formed a part of the contracts of subscription, which must be considered and determined in enforcing the stock liability, and which present a fair case for argument as to the lim-

itation of the liability of the stockholders, or even absolute non-liability.

In the case at bar, there were no formal stock subscriptions, that is to say, no contract, offer or promise on the part of the subscribers to take stock, and no express agreement to pay for the same. In such a case there is a sharp conflict in the authorities, as to whether there would be any contract of subscription enforceable at common law. A large class of cases exist, which hold that the mere acceptance of the stock, and assuming the relation of stockholder to the corporation by taking part in its business operations, so as to recognize the existence of the relation of stockholder, would be sufficient to imply a contract to pay for the same. On the other hand it has been the settled doctrine of the courts of the New England States, that in the absence of any promise definite in its character, on the part of the stockholder, to take and pay for the stock, there can be no liability to the corporation or its creditors which does not proceed from the statute under which it is created. (See New Haven Horse Nail Co. v. Linden Springs Co., *supra*.) So that it would seem in this case that it is very doubtful whether there would be any common law liability on the part of any subscriber for stock in the Mexican Southeastern Railroad Company, and that liability could not be worked out without reference to the statutes of the Territory of New Mexico.

Many of these doctrines are adverted to by our Supreme Court, in the case of Young v. Farwell, 139 Ill. 326. That was a case brought by a judgment creditor, who was a citizen of the State of Michigan, against a citizen of the State of Illinois, who was a stockholder in a corporation organized under the laws of Michigan. It was an ordinary creditor's bill like the present, and just such a creditor's bill to enforce stock liability as had been held to be good in the case of Hatch v. Dana, *supra*, and the Illinois decisions following that case. The only respect in which the case of Young v. Farwell could be distinguished from the case of Hatch v. Dana, and the prior decisions in Illinois, was that the corporation in Young v. Farwell was a foreign corporation, and that is the real turning point in the decision. The case of Hatch v. Dana is cited in the case of Young v. Farwell, and the doctrine of it approved, or at least not dissented from, and it is said that although a judgment creditor may seek satisfaction of his judgment by creditor's bill against a single delinquent stockholder of the corporation, yet the stockholder in such case is entitled

to file a cross-bill to obtain a discovery of the other stock-holders, and bring them before the court, for the purpose of enforcing contribution. But they say this is manifestly impossible except in the state where the corporation has its existence and most of the stockholders reside. They say that no relief could be had upon such a cross bill in that case, for the reason that the corporation was beyond the jurisdiction of our court, and no orders made in this State could be obligatory upon the corporation, or its property, in any other state, or in the State of Michigan.

In the case of Young v. Farwell, it appeared that a statute of the State of Michigan existed, substantially similar to the statute of the Territory of New Mexico in the case at bar, which provided that in case of the failure of stock-holders to pays calls, the stock might be forfeited. No other remedy was provided by the statute of Michigan in case of the failure of the stockholder to pay, except the forfeiture of his stock, and it was said by the Supreme Court in the case of Young v. Farwell, that if they should undertake to adjudicate upon the relations between the stockholders and the corporation, and its creditors, they would be obliged to determine whether purchasers or pledgees of unpaid shares of stock in corporations organized under the laws of Michigan were to be held liable to the creditors of such corporations, and whether also such creditors were entitled to collect their debts from the holders of unpaid stock, as general debtors of the corporation, or whether the only remedy in such case was limited to a forfeiture and sale of the shares of unpaid stock. The court say that this latter question seems to be a question of doubt under the statute of Michigan, and such being the case, the courts of this State would not undertake to decide it, for fear of a possible conflict between their decision and the decision of the court of Michigan, which might result in possible injustice to either the creditors or the stockholders.

This same case was considered by the Appellate Court of Illinois for the First District, reported in Farwell v. Wadsworth, 35 Ill. App. 469, and that court, Judge Gary delivering the opinion, took the same view of this statute as the Supreme Court did, and held that under the statute of the State of Michigan there was no personal liability on the part of the stockholder, the remedy by forfeiture of the stock being conclusive. The statute of the Territory of New Mexico in the case at bar, in this respect, is exactly similar to the statute of the State of Michigan, considered in Young v. Farwell, *supra.*

Counsel for complainants say, that wherever a remedy by forfeiture of the stock is provided for non-payment of calls, the remedy is cumulative, and does not exclude the remedy by suit; but this of course must depend upon the language of the statute. It is quite plain that the legislature has the right and power to enact that there shall be no personal liability, and that the remedy by forfeiture of the stock shall be conclusive, and the determination of this question by any court, must of necessity involve the consideration and construction of the statute.

But it is said by counsel for complainants, that if no construction of the statute has been made by the courts of New Mexico, this court will construe the statute, and enforce the statutory liability. I understand the rule to be, however, that the statutory liability in a suit of this character will not be enforced until the statute has been fully construed by the courts of the state enacting it. It is quite plain that any other rule would be dangerous, and liable to produce injustice. The true intent and meaning of the statute is sometimes a very difficult question to get at, and in a case of this character especially, might very largely depend upon the judicial and legislative policy of the state. It is the policy of some states to enlarge the stockholder's liability, and to provide liberally for the rights of the creditor. It is the policy of other states to construe the liability of the stockholder strictly, and to hold the creditor down to the letter of the law; thus it is plain that the construction of the statute might be affected by the local color, and policy, which the courts of a foreign state might be entirely unable to comprehend.

The case of Young v. Farwell, *supra*, concludes by plainly holding that a decree which would properly conserve the rights of both parties, creditors and stockholders, could not be entered in any other jurisdiction except in the state creating the corporation, and that in no other jurisdiction could a decree be rendered for an account and winding up of the affairs of the corporation, that would be conclusive upon the corporation, its stockholders and creditors, and the court refused to entertain jurisdiction of the case until after a bill had been filed in the courts of the State of Michigan, for the determination of the rights of the creditors and stockholders, as between each other.

As this decision seems to be directly in point, it probably ought not to be necessary to support it by argument, and yet some further considerations might be adverted to, which are peculiarly applicable to this case. The case at bar is

not like the case of Hatch v. Dana, and many other cases following the doctrine of that case, a suit to compel a stockholder, who has utterly failed to pay anything for his stock, or who has paid only a part of his stock subscription, to make good the deficit in favor of a creditor, where the corporation itself has failed to demand or collect the stock subscription. The case at bar is one where payment was made for the stock in a way and manner satisfactory to the corporation itself, and which transaction the creditor seeks to set aside as fraudulent, in its results as to him. The ground of recovery in cases of this nature seems to be fraud, either expressed or implied, and the action is therefore in its nature in tort rather than in contract. The tort in this case was a joint tort of all the original stockholders; all of the original issue of stock was issued at the same time, and was paid for in the same way by the concession, as one transaction, and the liability of the stockholders to the creditor, for the fraud or tort, in equity ought to be a joint liability, and ought to be prorated among the various stockholders, and a recovery against an individual stockholder would seem to work an injustice.

The case of Hatch v. Dana, *supra*, while in the particular case before the court did not work any injustice, is capable of producing an injustice if the principle is applied to all cases. For instance, it may be dangerous to lay down the rule broadly that the liability of the stockholder is in all cases separate, and not joint. While there may be cases where the application of this rule would result in no injustice, there might be others where it would. Primarily, and as between the corporation and the stockholder, the liability ought to be several, and there would be no injustice in calling it so, for the corporation being a going concern and presumably solvent, every stockholder would eventually have to pay in full. But when a corporation ceases doing business, and becomes insolvent, a different state of affairs is presented. The ultimate liability of the stockholder in such case is not to pay his entire subscription, but to pay so much thereof, ratably with the other stockholders, as may be necessary to discharge the corporate debts and liabilities, and such a liability, if enforced on equitable principles, would necessarily be joint, and not several.

I have come to the conclusion, therefore, based principally upon the decision in Young v. Farwell, *supra*, that this court is without jurisdiction to hear and determine the issues involved in this case, or at least that under the decision

in Young v. Farwell, *supra*, this court will refuse, for rea-·
sons of policy or otherwise, to entertain jurisdiction of the
case. As the order of reference, however, directs me to
report upon all the issues in the case, I shall, in compliance
therewith, report my further conclusions of law and fact
with reference to the other points in the case.

The legality and sufficiency of the judgments obtained in
two of the cases upon which this creditor's bill was filed,
are questioned by the defendant Allerton. In this connec-
tion I find that in the cases in which Nelson D. Parkhurst
and Allen & Blake were plaintiffs, the summons in the case
was served upon Samuel Protine, as the clerk and agent
of said corporation, one summons being served on the 7th
of February, 1898, and the other on the 9th of February,
1898. The judgments in both cases were rendered by de-
fault. The claim of the defendant Allerton, is that these
judgments were obtained upon an illegal service, and for
that reason they are wholly null and void; that the com-
pany and its officers and directors had no knowledge of the
pendency of the suits until after the judgments had been
rendered therein; and said defendant alleges that the judg-
ments were secretly and surreptitiously obtained, in fur-
therance of a conspiracy for the purpose of wronging and
defrauding the stockholders of said company, and more
particularly the defendant Allerton. The defense is based
upon the position taken by the defendant Allerton, that Pro-
tine was not the clerk or agent of the Mexican Southeast-
ern Railroad Company at the time of the service of the
summons upon him, and in fact, that he never had been
such clerk or agent.

On this point I find that prior to the incorporation of
the Mexican Southeastern Railroad Company, the same per-
sons who were promoters of that corporation were also
connected with an enterprise (which was unincorporated)
known as the Lake Front Land Company. The object and
purpose of this association being to obtain title to certain
lands upon the lake front in the city of Chicago. I find
that the said Samuel Protine was first employed to assist
in this work by Charles Bary, at some time prior to the
month of May, 1897, and that he did perform some service
in looking up evidence to be used in the law suits which
were brought by the persons connected with the Lake
Front Land Company, and received some little compensa-
tion for that work. Considerable testimony was given
before me with relation to the question in whose employ-
ment the said Protine was after the month of April or May,

1897.   It appears from the evidence that it was about that time that the Mexican Southeastern Railroad Company rented its offices in the Rookery Building in this city, and continued to occupy the same through its general officers, and to transact business therein.   At the same time Protine moved into the offices, along with Charles Bary, Peacock and others who had been connected with the Lake Front Land Company and who are now connected with the Mexican Southeastern Railroad Company.   The witnesses Peacock and Charles Bary gave testimony before me to the effect that at the time Protine was served with summons in the above cases, he was employed by the Lake Front Land Company, and that he never was an employe or agent of the Mexican Southeastern Railroad Company, never performed any service for said company, and never received any salary or compensation from said company.

On the other hand, testimony was given before me by the witnesses Haynes, Parkhurst and Protine, to the effect that Protine was in general charge of the offices of the company; that he had a desk of his own in the entrance or waiting room, and carried a key to the offices, and was charged with the duty of opening the offices in the morning and closing them at night; that he also acted as a sort of errand boy, running such errands as he was requested to do by Charles Bary, for the Mexican Southeastern Railroad Company.   It also appears from the evidence that Protine performed considerable service with reference to the getting out of the issue of bonds of the company; that he took the bonds to the office of Mr. Allerton for the purpose of having them signed by him, and brought them back to the offices of the Mexican Southeastern Railroad Company, and that he also stamped the seal of the company on the bonds.

It is true that upon the evidence, the position of Protine was rather an equivocal one.   There was never any formal contract of employment, and there was never any fixed and definite contract for the payment of wages and compensation, although Protine testified that Charles Bary promised to pay him for his services when the bonds of the company were sold, and also that he got small sums from time to time for his living expenses, from Charles Bary and Peacock, and the witness Parkhurst testifies that he heard Charles Bary promise to pay Protine a salary for work to be done for the Mexican Southeastern Railroad Company. In this respect, however, the position of Protine was not substantially different from some of the other officers, agents and servants of the company. It appears from the

evidence that Peacock, Somers, and some other persons were acting as agents and servants of the company without any formal contract of employment, and as there was no money in the treasury of the company, compensation for any services to be performed was necessarily a question of the future. As to Protine's continuance in the employment of the Lake Front Land Company, it appears from the evidence that a decision was rendered by the commissioner of the land office about the month of March, 1897, which disposed of all the claims of the Lake Front Land Company to the lands on the lake shore, and from that time on there does not appear to have been any occasion for the services of Protine in working up evidence for the company, since the law suits in which he had been employed had been tried and determined.

The witness Hoffman also testifies that he had been performing services for the Mexican Southeastern Railroad Company in about the same manner as Protine had, before the employment of Protine, and that Charles Bary terminated the employment of the witness, at the same time telling him that Protine had been employed to take his place. It also appears from the evidence that after the ceasing of the company to do business, and the appointment of a receiver, Protine prepared and presented an account for his services to the Mexican Southeastern Railroad Company, or to some of its officers, and that this account was settled by Mr. Washburn, one of the solicitors for Mr. Allerton in this case, by the payment of fifty ($50) dollars.

I am satisfied from the evidence, and so find, that at the time of the service of the summons aforesaid, in the cases in which Parkhurst and Allen and Blake were plaintiffs, the said Samuel Protine was a clerk or agent of the Mexican Southeastern Railroad Company, and that the service of the summons upon him was regular and legal, and gave jurisdiction to this court to enter judgment against the corporation, for the amount of the indebtedness claimed, and I find that the evidence does not support the theory that there was any conspiracy between the plaintiffs in said judgments and the said Protine, or any other persons, for the purpose of obtaining judgment in said cases secretly and surreptitiously.

In the opening sections of the act of New Mexico under which this corporation was organized, it is provided that corporations for the construction or operation of railroads, etc., and the colonization and improvement of lands in connection therewith, may be formed according to the pro-

visions of the act, 'such corporations, and the members thereof, being subject to all of the conditions and liabilities herein imposed, and to no others.'    The statute then further provides in section 425, that the directors shall have power to call in and demand from the stockholders the sum by them subscribed at such times and in such payments as they may deem proper.    Notice of each assessment shall be given to the stockholders personally or by publication, or by posting up notices, and if after notice has been given any stockholder shall make default in the payment of the assessment upon the shares held by him, so many of such shares may be sold as may be necessary for the payment of the assessment.    The statute does not provide for any formal contract of subscription by the stockholders either before or after organization, and no provision is made in the statute for the bringing of suit against a stockholder, either by the corporation or its creditors, to collect stock subscriptions, or to enforce by action the payment of calls or assessments.

It is contended by the defendant Allerton, that these provisions of the statute of New Mexico entered into and formed a part of his contract of subscription; that he becomes liable only under and by virtue of the statutes of the Territory of New Mexico, and that that statute imposes no personal liability to pay for the stock, but provides as a sole remedy for the failure to pay for the stock, the forfeiture and sale of the same, with the provision that the stockholder shall be liable to no other condition or liability. The complainants contend, on the other hand, that the remedy given by the statute to forfeit the stock for failure to pay calls or assessments, is only cumulative, and that the remedy by action of assumpsit to collect the stock subscription in favor of the corporation, and the remedy by creditor's bill in favor of the judgment creditor, can be pursued irrespective of the statute, on general principles of the common law and equity.

It may be true, as between the corporation itself and the alleged stockholder, that no formal contract of subscription is necessary, and that the issuance of stock to, and acceptance by a person, makes him a stockholder without any formal subscription or contract to receive and pay for the same, and that a contract to pay for the same will be implied under such circumstances.    This, however, only reaches the primary liability of the stockholder to the corporation. There is excellent authority for the further position that the individual liability of stockholders to creditors, is always

a creature of statute, and that it does not exist at common law. Terry v. Little, 101 U. S. 216; New Haven Horse Nail Co. v. Linden Springs Co., 142 Mass. 349; Cook on Corporations, Sec. 47.

The Massachusetts case cited above even goes so far as to say, that in the presence of any promise definite in its character, on the part of the stockholder, to take and pay for stock, there can be no liability to the corporation or its creditors, which does not proceed from the statute under which it is created, and it seems to have been adopted as a general rule by the courts of the New England states, that where a statute provides a remedy for the non-payment of calls or assessments by forfeiture of the stock, and no personal action is given by the statute, and there is no express contract of subscription upon which a common law action can be based, that in such cases there is no personal liability. See Cook on Corporations, section 74.

If there were no peculiar statutory provisions of the Territory of New Mexico affecting the case, it might be that the want of a formal contract of subscription would not be vital, and that a contract to pay for the stock would be inferred from the mere fact of taking and retaining the same, and acting as a stockholder. But where, as in this case, there are provisions of the statute which seem to affect the liability, and fail to make provision for personal actions, either in favor of the corporation or its creditors, it must be true that the liability of the stockholder is to some extent dependent on the statute, and can not be determined solely upon common law principles.

It is contended by the complainants, however, first, that the Supreme Court of New Mexico has construed the statute in question in favor of personal liability; and, second, that in case they have not, that it becomes the duty of our own courts to construe the statutes of New Mexico and ascertain the liability. I am of the opinion that neither of these contentions is correct. The case relied upon as establishing the personal liability of the stockholder to the creditor, is Medler v. Hotel & Opera House Company, 6 N. M. 331. That was a suit brought by a judgment creditor to enforce personal liability on the part of stockholders in a case similar to the one at bar, where the stock has been paid for by property turned over to the corporation at a valuation fixed by the parties. Without considering the question of personal liability, or adverting to it in any way, the Supreme Court of New Mexico held the defendants not liable, because there was no evidence of any fraudulent or

intentional overvaluation of the property taken in payment of the stock. In my opinion the case can not be considered an authority in favor of personal liability, merely because the personal liability seems to be assumed by the court without argument. The point made and decided by the court was sufficient to dispose of the case favorably to the stockholders. The question as to whether there was any personal liability at all does not seem to have been raised by the counsel in the case, and it also has been overlooked by the court.

As to the further position, that in the absence of any authority in the Territory of New Mexico, it is the duty of this co to construe and enforce the statute, the law in this ems to be quite firmly settled the other way. In Young v. Farwell, 139 Ill. 326, the Supreme Cou. 'ate expressly refused to take jurisdiction of a simi. 'ause they would not undertake to determine w. substantially similar statute of the State of Michig. 'as personal liability or not; and in the case of Far. 'sworth, 35 Ill. App. 469, which was the same cas. oellate Court for the First District, that court we. to expressly hold that there was no personal liab. the statute of Michigan, which was not so strong 'ute of the Territory of New Mexico in this case.

In my opinion it i. of some doubt, whether, if the question should b 'sented to the Supreme Court of New Mexico, t. be any decision in favor of personal liability. The 'g in the Medler case, or in any other case from 'ico brought to my notice, to indicate what the 1 r judicial policy of that State is with respect to th 'iability of stockholders and corporations, and fo. .rt to undertake, under such a state of facts, to d. .ine the liability of defendant Allerton, would, it seem. to me, be to run all of the risk of making an improper decision, and of unduly affecting the rights of the defendant Allerton, which are adverted to in the case of Young v. Farwell.

Assuming that the defendant Allerton, under the foregoing state of facts, did become liable under the statutes of the Territory of New Mexico to the judgment creditors in this case, a further question is presented, whether the alleged transfer of the stock to Maclennan divested that liability. It is claimed by Allerton that on November 2, 1897, he disposed of all of his stock but one share, to John

D. Maclennan, and that the transfer of stock released him from further liability.

The law on this subject seems to be that if the stock is transferred in good faith, to a responsible person, and not for the purpose of escaping liability, that it has the effect to release the liability of the assignor, and to transfer the liability to the assignee. It does not seem to be necessary that there should be an actual sale of the stock.

I am of the opinion, and so find from the evidence, that the transaction relied upon by Allerton as a transfer of his stock, while not a sale for a valuable consideration, was such a perfected transfer of the stock, as to divest the liability of Allerton, provided Maclennan was a responsible person within the meaning of the law. The position taken by Mr. Allerton is that he received his stock in consideration that he would act as treasurer of the company, and would negotiate its bonds; that he made several efforts to negotiate the bonds without success, and that he therefore held himself liable to surrender the stock upon application, since he had not earned it. He admits that the transfer to Maclennan was made without any consideration. I find that the circumstances under which the transfer was made were as follows: John D. Maclennan had made a proposition to the company that if he could get seventy-eight thousand five hundred (78,500) shares of its capital stock, in addition to what he then held, he would finance the railroad, and complete the construction of it, and relieve the other stockholders from the payment of all debts. At the solicitation of Mr. Somers, Charles Bary and others agreed to get this amount of stock for him. It appears that while the negotiations were carried on they counted on getting the Allerton stock, the Porter stock, or nearly all of it, and a large percentage of Emil B. Bary's stock, and Charles Bary's stock. The negotiations for this agreement were between Maclennan and Charles and Emil B. Barry, and Mr. Somers, representing the railroad. Allerton did not seem to have been a party to the negotiations, or to have known of them before they took place, or to have authorized the Barys to make any agreement with reference to the transfer of his stock. It does appear from the evidence, however, that after the making of this agreement Mr. Allerton surrendered his stock to Charles Bary, at his request, to be by him transferred to Maclennan in pursuance of the agreement, and on or about November 2, 1897, the original certificate for seven thousand six hundred and fifty (7,650) shares issued to Mr. Allerton, was canceled, and two certif-

icates were issued in place thereof, one for seven thousand
six hundred and forty-nine (7,649) shares to John D. Mac-
lennan, and another for one share to Mr. Allerton. The
stock issued to Maclennan was receipted for by W. M.
White as agent, Mr. White being at that time an employe
of the defendant Allerton, and thereupon the stock was
sent to Maclennan at Cleveland, Ohio, who retained the
same for four or five months, and then returned it to Mr.
Allerton, saying that he could not or would not carry out
his contract or agreement with Bary. It thus appears
that there was nothing in the nature of a sale of the stock
by Mr. Allerton to Mr. Maclennan. Mr. Allerton did not
offer to sell any stock, and Mr. Maclennan did not want to
buy any stock from Mr. Allerton. It is apparent from the
evidence of Somers and Allerton that Maclennan was will-
ing to attempt to finance the railroad, and complete it, if
he could get in addition to what he had, seventy-eight
thousand five hundred (78,500) shares of stock. He did not
care from whom he procured the stock. The negotiation
was upon the theory that he would get the stock from the
company, or from all the stockholders and promoters
jointly. No individual stockholder had enough stock to
carry out the contract, and the outcome was that Charles
Bary agreed that he would himself give up some of his
stock, and would induce other stockholders to surrender
their stock to the company, and that in lieu thereof new
stock would be issued to Maclennan to the extent of seventy-
eight thousand five hundred (78,500) shares. Mr. Allerton
upon being approached was willing to do this, as according
to his own theory he was only to hold the stock in con-
sideration that he could negotiate the bonds, and not having
succeeded in doing that, he did not consider himself entitled
to the stock, and was willing to give it up. He gave it to
Charles Bary, to be surrendered to the company. I am of
the opinion, therefore, from the evidence upon this point,
that there was no sale of the stock to Maclennan, if a sale be
necessary to put an end to the liability of Allerton.

    I further find from the evidence that Maclennan did accept
the transfer of the Allerton stock to him, and that it did
become a completed transfer, so as to make him liable as
transferee in place of Allerton. As before stated, the
stock was receipted for by Mr. White, an employe of Mr.
Allerton, and was sent to Maclennan at Cleveland, Ohio.
He retained the same four or five months, and returned it
to Mr. Allerton, stating that he could not carry out his

agreement with Bary.   I am of opinion that this did create
a complete transfer of the stock to Maclennan.

It seems, however, to be the rule as laid down by the
authorities, that in order to extinguish the liability of the
assignor, the transfer must be made to a responsible person.
There is very little evidence of a definite character in this
record to show the financial responsibility of Maclennan.
While Maclennan is spoken of in a general way as a respon-
sible man, and a man of property, of good connections, and
good possibilities, the only evidence in the record at all
definite is contained in the report of the Bradstreet Com-
mercial Agency.   By this report Maclennan is claimed to
have been worth in October, 1897, about $200,000, and I
am of the opinion that this evidence is sufficient, as the case
stands, to show that he was worth in the neighborhood of
this amount.   The liability sought to be enforced in this
proceeding is about the sum of $25,000, and so far as appears
from the evidence in this case, nothing is due to creditors.
This sum, therefore, in my opinion, should be the measure
of Maclennan's solvency and responsibility to pay for the
stock transferred, and I am of opinion that Maclennan was
sufficiently responsible in a pecuniary sense as a transferee
of the Allerton stock.

The rule that the transfer must be made to a responsible
party, however, in my opinion, means something more than
that the transferee shall be pecuniarily responsible.   It also
means that the transfer must be made to a person who can
be made responsible to pay.   Therefore, if for any reason
the transferee could evade payment for the stock, by rea-
son of any defense which he could set up against his per-
sonal liability, then he was not a responsible person within
the meaning of the law.   Maclennan was not one of the
promoters of this company, or one of the original stock-
holders.   He does not seem to have had any connection
with the company until June 6, 1896, when he entered
into the contract of that date, became a director, and certif-
icates for seven thousand six hundred and fifty (7,650)
shares of stock, of treasury stock, so called, were issued to
him, as fully paid and non assessable.   It is claimed by the
complainants that it does not appear from the evidence
that he had any notice or knowledge of the manner in
which the stock subscriptions were paid, and such being
the case, that no personal liability could be enforced against
him, and the transfer would not, therefore, be to a respon-
sible person.

The position taken by counsel for defendant Allerton

on this point is, that the complainants were bound to prove, as alleged in their bill, that Allerton was a stockholder at the date of commencing this suit; that the certificate for Allerton's stock put in evidence, showed on its face an assignment to Maclennan, the cancellation of Allerton's stock and the issuance of new stock to Maclennan, and that the burden of proof was then on the complainants to establish the non-liability of Maclennan, by showing want of notice or knowledge of the manner of paying for the stock originally. Counsel for complainants contend, however, that the burden of proof is on the defendant Allerton, to discharge himself from liability as a stockholder, by showing that Maclennan, to whom the stock was transferred, was a solvent and responsible person within the meaning of the rule.   I am of the opinion that the defendants' contention is correct; that the liability of a stockholder is dependent upon his being such at the date of the commencement of the suit; that a transfer being shown by the complainants' evidence, which was accepted by the company, it was *prima facie* a valid and sufficient transfer, especially in view of the evidence showing Maclennan's pecuniary responsibility, and it became incumbent upon the complainants to show that the transfer was not sufficient to terminate Allerton's responsibility because of the fact that Maclennan could successfully defend any suit for the payment of the stock subscription.

This being so, it becomes necessary to determine from this record whether Maclennan could successfully interpose such a defense to a suit for the unpaid stock subscription.    My first impression upon the evidence in this record was that it was not sufficient to charge Maclennan with knowledge or notice of the manner in which the stock was subscribed and paid for, but upon more mature consideration I am forced to the conclusion that Maclennan did have, or must be presumed to have such knowledge or notice.    On June 6, 1896, Maclennan was elected a director of the company and assistant to the president, and on the same date entered into a contract with the company by which he agreed to advance the sum of $15,000, which was to be used for the purpose of making the deposit required by the Mexican Government upon execution of the concession aforesaid.    It thus became apparent to Maclennan at this date that the concession was the sole asset of the company; that it had no money in its treasury, and that the corporation already organized upon a basis of $10,000,000 of capital stock had no money with which to

pay for the concession; or, in other words, that no money representing the capital stock, either subscribed for, or to be issued, was in the treasury of the corporation. Although the agreement for issuing the stock in payment for the concession had been made on February 14, 1896, the stock had not been issued; and it was not until June 17, 1896, some twelve days after this contract was made, and after Maclennan had become a director in the company, that the certificate for $9,000,000 of the capital stock was issued to Emil B. Bary and George E. Detwiler, and the notation made on the stock book that the same was issued as original payment in full for the concession.

By the terms of the contract of June 6, 1896, Maclennan was, in substance, let into the enterprise upon the same footing as the original promoters, the consideration being that he should advance the $15,000 necessary to procure the issuance of the concession, and if the concession should fail of ratification he was to stand one-seventh of the loss of $15,000, and was to be a creditor for the remainder. From this time up to the transfer of the Allerton stock on November the 2d, 1897, a period of one year and five months, Maclennan continued to be a director of the company, and had entire charge of the work of construction. Maclennan's original issue of stock, amounting to seven thousand six hundred and fifty (7,650) shares, was issued without any other consideration than the contract of June 6, 1896, aforesaid, which contract was made before any stock had been issued, and in which his stock was called treasury stock. By the agreement made just prior to the transfer of the Allerton stock he also acquired a large amount of additional stock in the company, amounting to seventy-eight thousand five hundred (78,500) shares, upon his mere promise to finance the railroad and complete the construction of it and to assume the payment of its debts.

I am convinced from this evidence, therefore, and so find, that at the time Maclennan acquired the Allerton stock, on or about November 2, 1897, he must have known that it was originally issued to Allerton without any other consideration than the concession aforesaid, and that it had never been paid for in any other way; and I am further of the opinion that Maclennan, having been a director and officer of the company on June 6, 1896, prior to the issuance of any of the capital stock, is chargeable with the knowledge contained in the records of the company of the actual state of facts with reference to the original subscription for the stock and payment thereof by the concession. Such being

the case, the transfer to Maclennan of the Allerton stock becomes a valid and sufficient one, and the effect thereof was to terminate the liability of Allerton as a stockholder, with the exception of one share of stock, and to substitute therefor the liability of Maclennan as a transferee of 7,649 shares.

It is further contended by the complainants that the transfer was made for the purpose of avoiding liability on the part of the defendant Allerton, and was therefore fraudulent and void. In order to establish this contention it must appear from the evidence that the defendant Allerton, knowing or having good reason to believe that the corporation was insolvent, or about to fail, transferred his stock to an irresponsible third person, with the intention of escaping liability to creditors. In my opinion the evidence does not support this position. It is true, that the corporation was insolvent at the time of this transfer, and it must also be true that the defendant Allerton knew of that fact, but the evidence does not show that the transfer was made for the purpose of escaping liability. On the contrary, I find from the evidence that the transfer was made for the purpose of enabling the company to raise additional funds, or additional credit, for the purpose of prolonging its corporate life. The agreement between the company and Maclennan seems to have been entered into in entire good faith, with the hope and expectation on the part of all persons interested that Maclennan would be able to carry out this contract. The fact that Maclennan was unable to do as much as he expected, ought not to impeach the transaction as an evidence of fraud on the part of Mr. Allerton.

It is also claimed by the defendant Allerton, that Nelson D. Parkhurst and the Bancroft Lumber Company had knowledge, prior to, or at the time of the creation of the indebtedness due to them respectively, of the manner in which the capital stock of this corporation was subscribed and paid for, and having contracted with such knowledge, they are deemed to rely upon the corporate liability only, and can not be permitted to enforce the individual liability of the stockholders. The complainants Allen and Blake, who brought their common law action as the assignees of Nelson D. Parkhurst and Charles Bary, are chargeable with the same knowledge, through their assignors Parkhurst and Bary. I find, however, that neither Parkhurst nor the Bancroft Lumber Company had such knowledge as aforesaid, and therefore there is no ground for the alleged estoppel.

The evidence as to the complainant Parkhurst is some-what close. Two witnesses, Peacock and Charles Bary, testify to his knowledge. Peacock's evidence, however, is very general and indefinite. He makes the general state-ment that there was a conversation or general understand-ing between Parkhurst, Somers, himself, and all of the employes of the company, to the effect that the stock should be, or was going to be paid for by the concession. No time or place is fixed for any particular conversation, nor are the parties taking part in the same, identified.

It is not pretended by this witness that the manner in which the transaction was actually consummated was made known to Parkhurst, or even that Peacock himself knew the actual facts with regard to the transaction. In my opinion the general understanding that the concession had been or would be used to pay for the stock subscription was not sufficient to charge Parkhurst with knowledge, even if the evidence was sufficiently definite in other respects.

The witness Charles Bary testified in more specific terms. He states that he told Parkhurst about these things before he entered into the employment of the company; that it was expressly understood between the stockholders that means should be adopted to escape stock liability, and that to accomplish this purpose $9,000,000 of the stock was to be issued to the agents who obtained the concession, in payment of the same, and that thereupon the stock was to be transferred to the company, to be again issued to the stockholders, and that this would make the stock non-assessable. This statement at least shows the willingness and intention of the witness Bary to defraud the creditors by a bogus subscription to the stock. Parkhurst, however, testifies that no such conversation took place, and says that Bary said nothing to him about how the stock had been paid for, and that he did not in fact know the stock was paid for by the concession.

It further appears that the minute books containing the records of the corporate action in this respect were in the possession of the company at its office at the Rookery Building during the time Parkhurst was an employe of the company, and that he was in a position to have access to the books, but it does not appear that he ever examined the books. The burden of proof being upon the defend-ants to establish actual notice and knowledge on the part of Parkhurst, I am of the opinion that they have failed to maintain the issues in this respect, and I find that the evi-dence is not sufficient to charge Parkhurst with knowledge

of the transaction concerning the subscription to the stock, and the manner of its payment, as hereinbefore set forth.

The case against the Bancroft Lumber Company is still weaker on the evidence on that point. It rests substantially upon the fact that the Bancroft Lumber Company, before extending credit to the Mexican Southeastern Railroad Company, made inquiries of two commercial agencies, Bradstreet's and R. G. Dun & Company, and that in one of the reports of R. G. Dun & Company it was stated that the capital stock of $10,000,000 was in a great measure represented by the value of the concession acquired by the company from the Government of Mexico, the terms of the concession being stated briefly and in substance, together with other information given in the reports as to the financial standing and responsibility of Mr. Allerton, treasurer, Mr. Maclennan, the general manager, and Mr. Bary, the general counsel. It is claimed that by these reports the Bancroft Lumber Company had knowledge, or was put upon knowledge, as to the use of the concession to pay for the stock, and chose to rely upon the standing of the corporation and its officers as disclosed by the commercial reports, and sold its goods in reliance upon them, and ought therefore to be precluded from asserting the individual liability of the stockholders.

In my opinion the statement contained in the commercial report with respect to the concession was too general to charge the Bancroft Lumber Company with notice of the transaction which really took place. They did not know the terms or the value of the concession, or to what extent it had been valued, or how it had been used in the payment of stock, all of which were material facts. I therefore find that there is nothing in the evidence to support the claim that the Bancroft Lumber Company are estopped from asserting their claims against the defendant Allerton, for stockholders' liability in this case.

As to the complainants Allen and Blake, they, being the assignees of Parkhurst and Bary, would be chargeable with whatever knowledge their assignors had with respect to the stock subscriptions. Parkhurst, as hereinbefore found, had no such knowledge, but Charles Bary had undoubtedly full knowledge and participated in the transaction itself. To what extent the judgment in favor of Allen and Blake represents indebtedness due to Parkhurst and due to Bary, is not disclosed by the evidence. In my opinion, the burden of proof is on the complainants to show this. No apportionment having been made by them, it is fair to treat

the judgment as based wholly or substantially on the claim of Bary, especially since Parkhurst has recovered an individual judgment. It would be grossly inequitable, under the evidence in this case, to permit Bary, or any assignee of his, to recover anything from his fellow stockholders, and this infirmity, under the circumstances, taints the whole judgment. I therefore find that the complainants Allen and Blake are chargeable with notice such as to preclude them from enforcing their judgments in this cause.

Assuming that the defendant Allerton may be made personally liable in this case as a stockholder of the Mexican Southeastern Railroad Company, that he was not discharged by the transfer of that stock to Maclennan, and that jurisdiction exists in this case, the last point to be considered is, to what extent the defendant Allerton becomes liable because of the manner in which the stock was subscribed. Upon this point, and this point alone, in the case, the Supreme Court of the Territory of New Mexico expressed itself. In the case of Medler v. Hotel & Opera House Company, 6 H. M. 331, the case, when on hearing below, was referred to a master, who found that the arrangement by which the stockholders turned over certain land in part payment of their stock, while there was no question of the good faith of the parties as a matter of fact, was in law a fraud. He found the further necessary facts for the complainant, and recommended a decree against the defendants. The trial court reversed the findings of the master, and entered a decree dismissing the bill, holding that the arrangement whereby the stock was declared fully paid up and non-assessable, was a fair arrangement and not to be set aside, unless the overvaluation was intentional and fraudulent. This finding of the trial court was assigned for error. The question of good faith was thus fairly presented by the record.

The Supreme Court of New Mexico confirmed the decree of the lower court, and held there must be an intention on the part of parties to overvalue the property, which intention makes it fraudulent, and that in the case at bar there was no evidence of such intention. The court seems to assent to the doctrine that the fraudulent intention may be inferred from the gross nature of the overvaluation, but holds that in the case at bar there was no such discrepancy between the value of the real estate and the value of the stock disclosed by the evidence, as to raise a presumption of fraud in law.

This decision clearly puts the liability of the stockholders

on the ground of intentional overvaluation, which may be proven by direct or circumstantial evidence, and may be inferred as a matter of law from a certain state of facts, the intention, however, being the necessary element to create the liability. The converse of the proposition must be equally true, to wit, that where there is good faith in the valuation of the property given in payment of the stock subscription, it is a sufficient defense. Good faith, however, is not to be inferred merely because the parties believed they were acting in good faith. Their own good intentions are not decisive of the matter. The result of the transactions, as affecting the rights of the creditor, may be considered in arriving at the good faith.

It is said by the defendants that the Medler case is not necessarily conclusive of this question, since the decision in that respect is in no sense a construction of any provision of the New Mexico statute, but is simply the decision of a general proposition of law. If that is so, then this court is at liberty to apply its own rules to the decision of the question of good faith or fraudulent intention. I am unable to find that the rule in Illinois is in any respect different from that laid down in the Medler case. The law of this State, as stated in Coleman v. Howe, 154 Ill. 458, is substantially the same as that laid down in the Medler case, so that the rule of liability would be the same in Illinois as in New Mexico.

The question of fact thus recurs, was there an intentional overvaluation in the property which was given in payment for the stock? It should be remembered that at the time this stock was authorized to be issued, to wit, February 14, 1896, no concession had as yet been promulgated, and all that existed was the agreement of December 19, 1895, by which Emil B. Bary and George E. Detwiler agreed to construct a railroad under certain conditions, as to subsidies, etc., and one Rabassa, at the foot of the agreement indorsed the statement that he was authorized by the honorable secretary of the treasury to state that under the terms of that agreement the government would issue to them a concession. The concession was subsequently issued substantially in accordance with the terms of this agreement. The transaction, however, must be tested by the condition of affairs which existed when the stock was issued.

As to the actual intention of the parties to the transaction, it is as difficult in this case, as in any other case, to arrive at a satisfactory conclusion. The intentions of any person are locked up in his own bosom, and are only mani-

fested to other persons by outward signs and indications. So far as Charles Bary is concerned, we have his own very candid statement that the transaction was undertaken for the purpose of avoiding individual liability as stockholders, and that the plan was schemed out beforehand. It would be unfair, perhaps, to attribute to others concerned in the transaction the same fraudulent intent which Bary admitted he had, and it is not necessary to do this. The rule in the Medler case and the rule in Illinois both go to this extent, that if the overvaluation is gross and excessive, fraudulent intent may be inferred as a matter of law.

In this case the only evidence bearing upon the value of the concession, or the agreement of December 19, 1895, is that of the expert witnesses Geraldine and Stuart. The witness Geraldine was an experienced civil engineer, and went over a part of the right of way in question, and testified that in his opinion there was no profit in building the road under the terms of the concession. He could not, however, say whether or not the concession had a market value. The witness Stuart took a more hopeful view of the situation, and was of the opinion that under the terms of the concession, a railroad might be built, which after having been operated for some years might prove to be profitable. This witness also declined to put a money value upon the concession as it stood. So that there is no direct evidence in the record, expert or otherwise, as to the money value or market value of the concession. I think it is not difficult, however, to arrive at an idea of its value, by a consideration of the facts and circumstances.

It does not appear from the evidence that the agreement of December 19, 1895, cost anything whatever. It seems to have been obtained for the mere asking. In form it is nothing more than a proposition by Bary and Detwiler to build a railroad upon certain conditions, including a subsidy, and an acceptance of the proposition by Rabassa, on behalf of the secretary of the treasury. It does not appear that any other person might not have made the same proposition to the Mexican Government, and have obtained permission to build a railroad, either upon the route named, or elsewhere, upon the same terms and conditions. A thing which costs nothing, which has no market value, and can be sold for nothing, and the equivalent of which can be obtained for nothing, might be justly said to have no value whatever. Nor, if we consider the concession itself as the real consideration for the stock, is the situation altered in any material respect. The concession itself was obtained upon

application, the only cash consideration being the deposit of a certain sum of money as a security which, however, was to be returned to the concessionaires upon the performance of the contract.  It does not appear that any greater privileges were granted to the concessionaires than any other person could have obtained on application, nor that any cash consideration was paid for what was obtained.  It can not, therefore, be said that the concession had any money or market value.  As a matter of fact the value of the concession was entirely speculative, and existed, not in the concession itself, but in what might be done in pursuance of it.  If the promoters were successful in building a railroad, in an economical way, and if the subsidies were paid, and if the lands and minerals and timber turned out to be valuable and the railroad itself turned out to be a paying investment, then the concession might afterward be said to have had value.  But that was all in the future. The transaction, as stated before, is to be tested by the situation of things as they existed at the time.  I have no hesitation in finding, therefore, that neither the agreement of December 19, 1895, nor the concession granted in pursuance of it, had any value whatever as a purchasing power for stock at the time it was used for that purpose.

If this finding of fact is correct, the application of the law to the case becomes simple.  If the concession had no value whatever, then there was no consideration whatever for the issue of $9,000,000 of stock, and the valuation of the concession at $9,000,000 for the payment of stock, when it had no value whatever, would be conceded to be a gross overvaluation, in fact, an issuance of stock upon no consideration whatever.  In such a case as that the Supreme Court of New Mexico, and the Illinois Supreme Court, both concur in saying, that a fraudulent intention may be inferred as a matter of law, or that the result of the transaction is a legal fraud upon the creditor, which gives him the right to attack and overturn the transaction.

In conclusion, therefore, I respectfully recommend to the court that the bill of complaint be dismissed for want of jurisdiction to entertain the same by this court, but that if the court shall be of the opinion that it has jurisdiction to entertain the case, and that there is personal liability under the statute of New Mexico, then, that the extent of the liability of the defendant Allerton is confined to one share of stock in the defendant company, for which no payment has been made, and that he is liable to the full amount of the par value of said one share of stock, to be applied on

account of the indebtedness found due to the complainant as aforesaid."

By the decree that was entered said report was modified in respect only of holding that the court had and would exercise jurisdiction to hear and determine the cause. Accordingly the court found that Allerton was liable to the appellants for the full par value of his said one share of stock and decreed accordingly.

We think the decree was right and it is affirmed.